UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

GRISSEL NUNEZ, *as parent and natural guardian of I.N.P., an infant*,

                Plaintiff,

      -v-

JPMORGAN CHASE BANK, N.A.,

                Defendant.

23 Civ. 7569 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Grissel Nunez, on behalf of her daughter, I.N.P., and a putative class of minors, alleges that JPMorgan Chase Bank ("Chase") "committed a tortious act" by failing to place children's court-ordered settlement funds in "the highest interest bearing account possible." Dkt. 1 ("Notice of Removal"), Ex. 1 ("Compl.") ¶ 4; *see also* Notice of Removal ¶ 1. Nunez filed suit in New York State Supreme Court. Chase removed the case to this Court, asserting subject matter jurisdiction based both on diversity, 28 U.S.C. § 1332(a), and the Class Action Fairness Act ("CAFA"), *id*. § 1332(d).

      Pending now are two motions. Nunez has moved to remand this case to state court. Chase has moved to compel arbitration based on the Deposit Account Agreement ("DAA") that Nunez signed when she deposited her daughter's settlement funds. For the reasons that follow, the Court denies both motions.

1

I.  **Background**

   A.  **Factual Background**[1]

In April 2023, after three years of litigation, Grissel Nunez's daughter, I.N.P., was awarded $750,000 in a medical-malpractice settlement. *See* Compl. at 9; *see also Nunez v. Baez*, No. 24297/2020E (N.Y. Sup. Ct., Bronx County), Dkt. 87 (filed May 24, 2023). Of that $750,000, $523,937.52 was set aside for I.N.P. to access on her 18th birthday. Compl. at 9. Until then, that sum was to be divided up in three bank accounts. *Id.* Relevant here, $200,000 was to be deposited with Chase, "in the highest interest bearing account possible." *Id.* On May 24, 2023, Justice Michael A. Frishman of the New York Supreme Court in Bronx County so-ordered the settlement and appointed a referee to examine reports of the relevant fiduciaries, including Chase. *See id.* at 8–18.

On July 7, 2023, Nunez duly opened a Certificate of Deposit ("CD") account with Chase, in which she deposited the relevant sum. *Id.* at 19. To her surprise, however, Chase refused to pay I.N.P. the then-prevailing interest rate of 4.5%; instead, it offered only a savings account paying 0.01% each year. *Id.* ¶¶ 5–6; *see also id.* at 19 (copy of receipt provided to Nunez by Chase).

Two weeks later, on July 26, 2023, Nunez filed suit against Chase on I.N.P.'s behalf, alleging that Chase "committed a tortious act within New York State in that it failed to comply with an Order of the Hon. Michael A. Frishman dated May 23, 2023 . . . which Order mandated that it open 'the highest interest bearing account possible'" with Chase to deposit "the

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings, Dkt. 1 ("Notice of Removal"); Dkt. 1, Ex. 1 ("Compl."), and their memoranda of law and attached declarations, Dkt. 10 ("Pl. Remand Br."); Dkt. 13 ("Def. Remand Br."); Dkt. 19 ("Def. Arbitration Br."); Dkt. 20 ("Deck Decl."); Dkt. 21 ("Reid Decl."); Dkt. 22 ("Garrett Decl."); Dkt. 23 ("Pl. Arbitration Br."); Dkt. 28 ("Def. Arbitration Reply Br.").

$200,000.00 settlement check." *Id.* ¶ 4.  Nunez also brought suit on behalf of a putative "[c]lass of [i]nfants whose funds from legal cases were not placed in the highest interest bearing accounts possible despite [c]ourt [o]rders mandating same." *Id.* at 1.  As relief, Nunez sought an order (1) "[c]ertifying the class," (2) requiring Chase "to immediately convert the savings account opened for [I.N.P.] to a CD account paying [I.N.P.] the highest current interest rate," (3) awarding "[a]ctual damages lost by the class because of the lower interest rate given to 'court ordered' accounts," (4) awarding "[p]unitive damages," and (5) awarding "[a]ttorney's fees, plus costs and disbursements." *Id.* at 3-4.

### B.     Procedural Background

On July 26, 2023, Nunez filed this action in the New York State Supreme Court in Bronx County, Dkt. 1, Ex. 1 ("Compl."), which Chase removed to this Court on August 25, 2023.  *See* Dkt. 1 ("Notice of Removal"); *id.*, Exs. 3 ("Simson Removal Decl."), 5 ("Leicht Decl.").  On August 29, 2023, Nunez moved to remand the case to state court.  Dkt. 10 ("Pl. Remand Br."). On September 12, 2023, Chase filed a memorandum of law in opposition.  Dkt. 13 ("Def. Remand Br.").  On September 13, 2023, upon notice from Chase that it intended to move to compel arbitration, the Court set a briefing schedule for that motion, and notified the parties that it would resolve the two motions concurrently.  Dkt. 15.  On September 14, 2023, Chase moved to compel arbitration and stay this action, Dkt. 18, and filed a memorandum of law in support, Dkt. 19 ("Def. Arbitration Br."), and three declarations, Dkts. 20 ("Deck Decl."), 21 ("Reid Decl."), 22 ("Garrett Decl.").  On September 26, 2023, Nunez filed a declaration in opposition to the motion to compel arbitration.  Dkt. 23 ("Pl. Arbitration Br.").  On October 5, 2023, Chase filed a reply, Dkt. 29 ("Def. Arbitration Reply Br."), and a declaration, Dkt. 29 ("Simson Arbitration Decl.").

## II. Discussion

### A. Nunez's Motion to Remand

#### 1. Legal Standard

"Any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). On a motion to remand, "the defendant bears the burden of demonstrating the propriety of removal." *Cal. Pub. Emps.' Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004) (citation omitted).

#### 2. Discussion

In its notice of removal, Chase asserted subject-matter jurisdiction based on both CAFA and diversity jurisdiction. Notice of Removal ¶¶ 15–35. Both grounds support jurisdiction here.

##### a. CAFA

"CAFA provides the federal district courts with original jurisdiction to hear a class action if [1] the class has more than 100 members, [2] the parties are minimally diverse, and [3] the matter in controversy exceeds the sum or value of $5,000,000." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 28 U.S.C. §§ 1332(d)(2) & (d)(5)(B)). All three criteria are met here.[2]

---

[2] The Court rejects Chase's assertion that Nunez's failure to brief this issue "amounts to a concession that CAFA jurisdiction exists" or otherwise "waive[s]" the point. Def. Remand Br. at 13. "'[B]ecause it involves a court's power to hear a case,' subject-matter jurisdiction cannot be forfeited, waived, or conferred by consent of the parties." *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (alteration in original) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)). "[E]ven in the absence of a challenge from any party," the Court has an "independent obligation" to ensure its subject-matter jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

4

First, there is at least a "reasonable probability" that Nunez's putative class has more than 100 members. *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 58 (2d Cir. 2006). To be sure, Nunez's barebones complaint does not quantify the size of her proposed class. But that does not pose an obstacle to removal. Chase has provided the sworn declaration of its employee Phillip Leicht, who has identified "[t]housands of open court-controlled accounts . . . where the ward/ultimate beneficiary of the account was less than 18 years old . . . at the time of account opening," "[h]undreds" of which are in New York. Leicht Decl. ¶ 3.[3] Removing defendants often rely on such business records to satisfy CAFA's numerosity requirement. *See, e.g., Musiello v. CBS Corp.*, No. 20 Civ. 2569 (PAE), 2020 WL 3034793 (S.D.N.Y. June 5, 2020) (use of human resources records to determine number of employees who fall within the class definition); *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 352–53 (S.D.N.Y. 2019) (use of law firm's records to determine number of clients who fall within the class definition); *Henry v. Warner Music Grp. Corp.*, No. 13 Civ. 5031 (PGG), 2014 WL 1224575, at *2 n.1 (S.D.N.Y. Mar. 24, 2014) (use of human resources records to determine number of unpaid interns who fall within the class definition). In the absence of countervailing evidence from Nunez, the Court accepts Chase's representation that the putative class, as framed by Nunez's complaint, has more than 100 members.

Second, the parties are minimally diverse—that is, "at least one plaintiff and one defendant are citizens of different states." *Blockbuster*, 472 F.3d at 56. The named parties—Nunez and Chase—are diverse. Nunez "resides in Bronx County" and is thus a citizen of New

---

[3] Nunez has not argued that, at the pleading stage, Chase must make a more demanding showing of membership in the putative class (*e.g.*, that person(s) responsible for such accounts were obliged by court order to invest such accounts at the highest available interest rate, or that deposits in such accounts received a non-prevailing interest rate).

York. Compl. ¶ 1. As a national banking association, Chase is a citizen of Ohio, "the State in which its main office, as set forth in its articles of association, is located." *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 307 (2006); *see also* Notice of Removal ¶ 18. Minimal diversity is thus satisfied.

Third, there is at least a "reasonable probability" that the matter in controversy exceeds $5 million. *Blockbuster*, 472 F.3d at 59. Nunez's counsel has asserted that Chase's "improper interest rate" has caused I.N.P. $50,000 in "actual loss," and that "the potential verdict for the class" is $50,000,000, "if there are but 1,000 people in the United States who were similarly wronged." Pl. Remand Br., Ex. 2 at 6 (email from Nunez's counsel to Chase's on Aug. 11, 2023). Where, as here, "the pleadings are inconclusive as to amount in controversy, then the courts may look to documents outside the pleadings to other evidence in the record to determine the amount in controversy." *Yong Qin Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010). One such source of evidence is settlement offers, when offered in good faith. *See, e.g.*, *Champion v. CVS Albany, LLC*, No. 22 Civ. 7748 (JMA) (ST), 2023 WL 1766284, at *2 (E.D.N.Y. Feb. 3, 2023) (collecting cases). Here, Nunez's counsel's estimate in the course of settlement discussions is consistent with an amount at issue plausibly exceeding $5 million.[4]

As a result, the Court concludes that removal was proper under CAFA.

---

[4] Nunez's argument that the parties' settlement discussions "should be totally ignored because they are 'inadmissible' as any type of evidence" is meritless. Pl. Remand Br. at 4. "Although settlement negotiations are not admissible at trial pursuant to Federal Rule of Evidence 408 to prove liability for or invalidity of the claim or its amount, they can be considered 'to show the stakes' when determining whether the amount in controversy is met." *Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006) (Easterbrook, J.); *see also Major v. Diageo N. Am., Inc.*, No. 22 Civ. 3027 (LJL), 2022 WL 2079756, at *2 (S.D.N.Y. June 9, 2022) (collecting cases).

*b.      Diversity jurisdiction*

A federal court has diversity jurisdiction over a civil action between (1) "citizens of different States," (2) "where the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a); *see, e.g.*, *75,000 Wash. Nat'l Ins. Co. v. OBEX Grp. LLC*, 958 F.3d 126, 133 (2d Cir. 2020). Both criteria are met here.

First, the parties are "completely diverse"—that is, no plaintiff shares a citizenship with any defendant. *See, e.g.*, *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir. 2014). There are only two parties: Nunez, a citizen of New York, and Chase, a citizen of Ohio. Notice of Removal ¶¶ 16, 18. "[D]iversity of citizenship is determined by reference to the parties named in the proceedings before the district court, as well as any indispensable parties who must be joined pursuant to Rule 19 of the Federal Rules of Civil Procedure." *Dr.'s Assocs., Inc. v. Distajo*, 66 F.3d 438, 445 (2d Cir. 1995). It is thus irrelevant that Nunez "could" have included Chase employee Raul Grullon, who opened I.N.P.'s account, as "a named defendant to specifically defeat" diversity, Pl. Remand Br. at 5, a gambit that would likely have been improper in any case, *see, e.g.*, *Bounds v. Pine Belt Mental Health Care Res.*, 593 F.3d 209, 215 (2d Cir. 2010) (discussing fraudulent joinder). Nunez does not argue that Grullon is an indispensable party under Rule 19, and the record discloses no basis to so argue. With Grullon put aside, complete diversity exists in this case.

Second, the Court cannot say "to a legal certainty" that Nunez's individual claim "does not meet the jurisdictional threshold" of $75,000. *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)). In the context of diversity jurisdiction, unlike under CAFA, Chase may not aggregate the class claims to meet the amount in controversy. *See Troy Bank v.*

7

*G.A. Whitehead & Co.*, 222 U.S. 39, 40–41 (1911) (permitting aggregation of multiple plaintiffs' claims only when plaintiffs seek to "enforce a single title or right, in which they have a common and undivided interest"); *see also, e.g.*, *Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1422–23 (2d Cir. 1997) (discussing the "non-aggregation" rule). However, as Chase notes, Nunez alone, per her counsel, pursues $50,000 in actual damages, "and 10x" that amount in punitive damages (*i.e.*, $500,000), which together well exceed the $75,000 threshold. Pl. Remand Br., Ex. 2 at 6; *see also* Compl. at 4 (demanding punitive damages). Given Nunez's threadbare complaint, which does not plead (or even reference) a particular cause of action, it is difficult to conclude whether punitive damages could plausibly prove available in this case assuming liability is established. But, given that the "record does not foreclose th[e] possibility" of punitive damages, Nunez's request for punitive damages is properly considered in assessing the amount in controversy. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991); *see also, e.g.*, *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Trust Co. of Chicago*, 93 F.3d 1064, 1070–71 (2d Cir. 1996) ("[T]he legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim."). The Court finds that Nunez's individual claim exceeds $75,000 for jurisdictional purposes.

Removal thus was also proper under diversity jurisdiction. The Court therefore denies Nunez's motion to remand this case to state court.

    **B.**    **Chase's Motion to Compel Arbitration**

        **1.**    **Legal Standard**

The FAA provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "creates a body of federal substantive law establishing and

8

regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alteration and citation omitted).  "In deciding whether to compel arbitration, a court must first decide whether the parties agreed to arbitrate." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).  "Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (3) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Id.*; *see also Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

On a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).  Courts thus "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* (citation omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided

9

against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted).  Where, however, "there is a disputed question of material fact," *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022), "the court shall proceed summarily to the trial thereof," 9 U.S.C. § 4.

The party moving to compel arbitration "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order).  The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.*  Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

To determine whether parties have agreed to arbitrate and whether such an agreement is enforceable, courts apply state contract law.  *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993).  Here, the parties do not appear to dispute that New York law governs that inquiry.  *See* Def. Arbitration Br. at 6–7 (arguing that Nunez "entered into a valid agreement to arbitrate under settled New York law"); Pl. Arbitration Br. at 2 (arguing that arbitration agreement "is a contract of adhesion" based on precedents interpreting New York law).  "[S]uch implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

### 2. Discussion

Chase moves to compel arbitration based on a provision contained in the Deposit Account Agreement ("DAA") that Nunez signed when she opened her daughter's Chase account on July 7, 2023. Deck Decl. ¶ 4. That provision reads, in full, as follows:

*X. Arbitration; Resolving Disputes*

You and we agree that upon the election of either of us, any claims or disputes (as defined below) will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court).

This arbitration agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").

YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL, AND YOU AND WE ARE ALSO WAIVING ANY ABILITY TO ASSERT OR PARTICIPATE IN A CLASS, REPRESENTATIVE, OR CONSOLIDATED PROCEEDING, WHETHER IN COURT OR IN ARBITRATION. ALL DISPUTES, EXCEPT AS STATED BELOW, MUST BE RESOLVED BY BINDING ARBITRATION WHEN EITHER YOU OR WE REQUEST IT.

**What claims or disputes are subject to arbitration?**

Claims or disputes between you and us about your deposit account, transactions involving your deposit account, and any related service or agreement with us are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between us, or the advertising, the application for, or the denial, approval or establishment of your account are included. Claims or disputes are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist or may arise in the future. All such claims or disputes are referred to in this section as "Claims." The only exception to arbitration of Claims is that both you and we have the right to pursue a Claim in a small claims court instead of arbitration, if the Claim is in that court's jurisdiction and proceeds on an individual basis.

> **Can I (customer) cancel or opt out of this agreement to arbitrate?**
>
> You have the right to opt out of this agreement to arbitrate if you tell us within sixty (60) days of opening your account. Requests to opt out of this agreement that are made more than sixty (60) days after opening your account are invalid. If you already have pending litigation or arbitration against/with us when you open an account, any request to opt out of this arbitration clause will not apply to that litigation or arbitration. If you want to opt out, call us at 1-800-935-9935. Otherwise this agreement to arbitrate will apply without limitation, regardless of whether 1) your account is closed; 2) you pay us in full any outstanding debt you owe; or 3) you file for bankruptcy. Opting out of this agreement to arbitrate will not affect the other provisions of this agreement. If you validly opt out of this agreement to arbitrate, your decision to opt out will apply only to this arbitration agreement and not any other arbitration agreement.

*Id.*, Ex. 1 ("DAA") at 26 (emphasis and capitalization in original).

The parties' dispute centers on the agreement's opt-out provision. Under the DAA, as quoted above, Nunez had 60 days after opening I.N.P.'s account to "tell [Chase]" that she wished to exercise her "right to opt out of th[e] agreement to arbitrate." *Id.* Because Nunez opened the account on July 7, 2023, Compl. ¶ 6, she had until September 5, 2023 to so inform Chase. According to Chase, its "records do not reflect any opt-out request from Ms. Nunez, personally or on her minor child's behalf"—that is, Nunez did not call the phone number listed in the DAA to notify Chase of her desire to opt out. Garrett Decl. ¶ 3. What Nunez did do, however, is file suit (and effectuate service on Chase) on July 26, 2023—only 19 days after she opened I.N.P.'s account, and thus well before the September 5, 2023 deadline. Notice of Removal ¶ 1. The issue, then, is whether Nunez, by filing suit, opted out of Chase's mandatory arbitration provision.

Although the question is close, the Court holds that she did. The same "principles of state law that govern the formation of ordinary contracts" apply to the arbitration agreement. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996); *see also Zachman*, 49 F.4th at 101. Under New York law, the one issue presented here—whether Nunez opted out—implicates

two separate inquiries. First, does the DAA, properly interpreted, allow a customer to opt out of arbitration by filing suit? Second, if it does not, did Nunez nonetheless substantially comply with the DAA's terms, so as to support finding that she opted out? *See, e.g.*, *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 395 (2d Dep't 2006) ("[S]trict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation."). The Court considers each question in turn.

### a. Interpretation of the DAA

Under New York law, the Court must first attempt to "ascertain the intent of the parties from the plain meaning of the language employed." *Tigue v. Com. Life Ins. Co.*, 631 N.Y.S.2d 974, 975 (4th Dep't 1995). Unambiguous contract provisions "must be given their . . . ordinary meaning." *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 10 N.Y.3d 170, 177 (2008). But if a provision is ambiguous, its interpretation "is a question of fact," which may be resolved as a matter of law only if there is "no relevant extrinsic evidence of the parties' actual intent." *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) (citing *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1183 (2d Cir. 1993)).

The Court finds the DAA ambiguous as to whether filing suit against Chase operates as sufficient notice of a customer's intention to opt out of the arbitration agreement. A contractual provision is ambiguous where it is "susceptible of at least two fairly reasonable interpretations." *Am. Home Assur. Co. v. Baltimore Gas & Elec. Co.*, 845 F.2d 48, 51 (2d Cir. 1988). Here, the Agreement does not make clear the full range of methods a customer may use to opt out—and, in particular, whether filing suit falls within the scope of the relevant provisions. The DAA informs the reader: "You have a right to opt out of this agreement to arbitrate, as discussed below." DAA

at 26 (capitalization omitted).  It then states: "You have the right to opt out of this agreement to arbitrate if you tell us within sixty (60) days of opening your account."  *Id.*  But it does not set out an exclusive list of means by which the customer may "tell us" she is opting out.  Nowhere does the DAA expressly "require specific language, a particular method of delivery, or delivery to a specified address."  *Nyachira v. New Prime, Inc.*, No. 21 Civ. 3211 (BP), 2022 WL 19239772, at *6 (W.D. Mo. May 5, 2022) (interpreting a similarly worded provision).  To be sure, the provision identifies *one* way of opting out: "If you want to opt out, call us at 1-800-935-9935."  DAA at 26.  And the next sentence *could* be read to make that method mandatory: "Otherwise this agreement to arbitrate will apply without limitation . . . ."  *Id.*  But the term "[o]therwise" could *also* be read to refer more generally to each customer's "right to opt out," and the need to "tell [Chase] within sixty (60) days" of an intention to do so, *id.* (capitalization omitted), as opposed to referring to the opt-out method consisting of calling the toll-free 800 number.  Chase appears to concede as much.  Its opening brief acknowledges that Nunez could have opted out *either* by "calling a toll-free number *or* [by] contacting a Chase banker."  Def. Arbitration Br. at 9 (emphasis added); *see also* Garrett Decl. ¶ 2 (declaration of Chase's Assistant General Counsel: "Chase's [DAA] permits customers to opt out of arbitration either by calling a toll-free number or by contacting a Chase banker").  In other words, even Chase does not read the DAA to require its customers to call its toll-free 1-800 number to opt out of arbitration.  The Court thus has no warrant for adopting that view.

Because neither party has offered extrinsic evidence, the Court must resolve the ambiguity through the canons of construction.  *See Mellon Bank*, 31 F.3d at 116.  Under New York law, it is well settled "that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it."  *151 W. Assocs. v. Printsiples*

14

*Fabric Corp.*, 61 N.Y.2d 732, 472 (1984); *see also Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000).  That rule supports construing the ambiguity to favor Nunez, who accepted a "form contract[] in [a] consumer transaction[]" with a "powerful economic enterprise[]." *Carr v. Credit One Bank*, No. 15 Civ. 6663 (LAK), 2015 WL 9077314, at *4 (S.D.N.Y. Dec. 16, 2015).  As such, the Court interprets the DAA to allow a customer to opt out by "tell[ing] [Chase]" of her intention to do so "within sixty (60) days of opening [an] account" by any means that gives Chase actual notice.  DAA at 26.  Such an intention may be communicated by telephone, in-person communication (as Chase admits), or, as relevant here, by filing suit (as opposed to arbitration) and serving Chase within the DAA deadline.  *See Nyachira*, 2022 WL 19239772, at *6 ("Instituting a lawsuit in court communicates an intent to institute judicial proceedings and to not institute arbitral proceedings.").  By serving Chase with the lawsuit, Nunez adequately informed Chase of her intention to exercise her "right to opt out of th[e] agreement to arbitrate" and to proceed in court.  DAA at 26.

Seeking to avoid this conclusion, Chase invokes *Moses H. Cone*'s general presumption in favor of arbitrability.  This, Chase argues, "supplant[s]" *contra proferentum* "in the arbitration context." Def. Arbitration Reply Br. at 14.  But *Moses H. Cone* addresses a different issue.  It holds that, upon a finding of a valid arbitration agreement, "any doubts concerning the *scope of arbitrable issues* should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25 (emphasis added).  A scope question arises "when the parties have a contract that provides for arbitration of some issues" but it is unclear whether the particular dispute falls within that contract.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).  A scope question does not arise when it is unclear whether an enforceable contract continues to exist at all.  *See, e.g.*, *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000)

15

("whether an arbitration agreement is enforceable *vel non*" is not a "scope question[]" to which *Moses H. Cone* applies). "[T]he presumption in favor of arbitrability should only be applied 'where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand.'" *Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301, (2010)). And treating *Moses H. Cone* as overriding state-law interpretive canons in the context of a contractual opt-out provision would be in tension with the precepts that, as a "first principle," arbitration is "strictly a matter of consent," *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019), and that "background principles of state contract law" govern the interpretation of arbitration agreements, *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (cleaned up). The Court therefore finds it appropriate to apply *contra proferentum* in construing the means available under the DAA to a customer like Nunez who seeks to opt out. *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("[T]he common-law rule of contract interpretation that 'a court should construe ambiguous language against the interest of the party that drafted it' applies in interpreting arbitration agreements." (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)).

The cases Chase cites are not to the contrary. In each, the arbitration agreement at issue unambiguously required the consumer to use a specific method to opt out. The agreement in *Anderson v. Amazon.com, Inc.*, 478 F. Supp. 3d 683 (M.D. Tenn. 2020), informed customers of that one method in no uncertain terms: "[W]e are providing an Opt-Out Notice form. You must complete and mail that to us in order to opt out of the Agreement to Arbitrate." *Id.* at 689. In *Malamatis v. ATI Holdings, LLC*, No. 21 Civ. 2226 (ELH), 2022 WL 1591406 (D. Md. May 19, 2022), the agreement provided: "If I choose to opt-out of the 'Arbitration Agreement' I must

16

indicate in the comment section below my desire to opt-out." *Id.* at *22. In *Milfort v. Comcast Cable Communications Management LLC*, 309 F. Supp. 3d 1268 (S.D. Fla. 2018), the agreement informed customers that they "may decline to have your disputes with us arbitrated by notifying us" within 30 days either "by visiting" a particular website "or in writing by mail" with "a clear statement that you do not wish to resolve disputes with us through arbitration." *Id.* at 1272 (capitalization omitted).[5] And in *Page v. Alliant Credit Union*, No. 19 Civ. 5965 (SJC), 2020 WL 2526488 (N.D. Ill. May 18, 2020), the agreement authorized only two opt-out methods ("calling us" or "sending a secure message through our online banking system"). *Id.* at *1. These cases do not shed light on the situation here, in which the DAA set out a single but (by Chase's admission) non-exclusive method to communicate opting out. Chase could have written the DAA to require a single such method, as the examples discussed in this paragraph illustrate. It did not do so.[6]

      The Court thus holds that the DAA, properly interpreted, allowed Nunez to opt out of its mandatory arbitration provision by filing suit against Chase and serving it with notice within the 60-day timeframe.

---

[5] Indeed, in *Milfort*, the plaintiff failed to meet the 30-day deadline: he signed up for Comcast's services on November 17, 2017, but only filed suit on December 28, 2017. *See* Dkt. 1, *Milfort v. Comcast Cable Commc'ns Mgmt. LLC*, No. 17 Civ. 62576 (KMM) (S.D. Fla.).

[6] Chase does not argue that the question of whether Nunez opted out is itself delegated to the arbitrator. Such an argument would fail. "[C]ourts must decide 'at the outset' whether an enforceable arbitration agreement" continues to "exist[] at all" between the parties before turning to the question of delegation. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022). As such, as the First and Third Circuits have explained, whether the parties "agreed to extinguish their arbitration pledge . . . is for the courts to decide" at this first step. *Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 514 (1st Cir. 2020); *accord Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019).

> b.      *Substantial compliance with the DAA*

Even if the DAA were interpreted to require Chase customers to opt out by telephone, that would not settle whether the arbitration agreement remains in place in this case. Under New York law, "strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation." *Fortune Limousine Serv.*, 826 N.Y.S.2d at 395 (collecting cases); *see also, e.g.*, *Agreement Vista Outdoor Inc. v. Reeves Fam. Tr.*, 234 F. Supp. 3d 558, 569 (S.D.N.Y. 2017), *aff'd*, 725 F. App'x 17 (2d Cir. 2018); *Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp. 3d 497, 510 (S.D.N.Y. 2015), *aff'd*, 675 F. App'x 31 (2d Cir. 2017).

Here, Chase received actual notice, and was not prejudiced by the method Nunez used to communicate such notice. Chase rightly does not contend that it lacked notice. "Instituting a lawsuit in court communicates an intent to institute judicial proceedings and to not institute arbitral proceedings." *Nyachira*, 2022 WL 19239772, at *6. The only reason a plaintiff would commence litigation is "to have [a] trial court decide the[] issues [presented], not an arbitrator." *Bickerstaff v. SunTrust Bank*, 770 S.E.2d 903, 908 (Ga. Ct. App. 2015), *rev'd on other grounds*, 788 S.E.2d 787 (Ga. 2016); *cf., e.g.*, *Butler v. Fairbanks Cap.*, No. 04 Civ. 67 (RMU), 2005 WL 5108537, at *5 (D.D.C. Jan. 3, 2005) ("filing suit after notice has been sent but prior to the expiration of the opt-out period" for a class-action settlement "is a sufficient expression of a class member's desire to be excluded from" the suit, even if the class member did not follow the procedures specified in the opt-out form itself); *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62, 69 (N.D. Cal. 1976) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 Civ. 5450 (NRB), 2019 WL 3006262, at *6 (S.D.N.Y. July 10, 2019) (same). Moreover, Nunez sought to proceed on behalf of a putative class—something that the DAA also

unequivocally forbids. *See* DAA at 26 ("You . . . are also waiving any ability to assert or participate in a class, representative, or consolidated proceeding, whether in court or in arbitration." (capitalization omitted)). From the time it received Nunez's lawsuit—a lawsuit barred by the DAA's plain terms—Chase was on notice that Nunez did not wish to be covered by its arbitration provision. It received that notice on July 26, 2023, when Nunez served Chase with a copy of the summons and her complaint—well before the September 5, 2023 deadline. Notice of Removal ¶ 1. Chase thus received actual notice.

Chase similarly does not contend that it was prejudiced by the method Nunez used to communicate her decision to opt out. That makes good sense. Just like a buyer who communicates her intention to cancel a purchase order by email, rather than by mail, *see, e.g.*, *Vista Outdoor Inc.*, 234 F. Supp. 3d at 569, or a tenant who sends his letter of termination to the landlord's old address, but also copies the landlord's law firm, *see, e.g.*, *Thor 725 8th Ave.*, 138 F. Supp. 3d at 510, there is no doubt Chase understood that Nunez sought to exercise her "right to opt out of th[e] agreement to arbitrate," even if she did not deliver the message via standard means, DAA at 26. She did, after all, inform the correct recipient (Chase's legal department), and she did so well within the appropriate timeframe (19 days into the 60-day window). Without any prejudice, Chase cannot demand "strict compliance" with its termination-by-telephone requirement. *See Fortune Limousine Serv.*, 826 N.Y.S.2d at 395; *cf. Bickerstaff*, 770 S.E.2d at 908 (reaching the same conclusion under Georgia law, holding that a plaintiff had "substantially complied" with a contract's opt-out provision, despite the fact that "the arbitration agreement laid out specific requirements" for termination that the plaintiff concededly had not met).

As such, Nunez has effectively opted out of the agreement, and it remains unenforceable against her.

The Court thus holds, in the alternative, that even if the DAA required Nunez to communicate her intent to opt out through a particular communication method, Nunez substantially complied with its provisions, such that she provided effective notice under New York law.[7] The Court denies Chase's motion to compel arbitration.

## CONCLUSION

For the foregoing reasons, the Court denies both motions. Chase must respond to Nunez's complaint by February 13, 2024. By separate order, the Court will schedule an initial pretrial conference. The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

                                                   *Paul A. Engelmayer*
                                                   Paul A. Engelmayer
                                                   United States District Judge

Dated: January 23, 2024
       New York, New York

---

[7] The Court rejects, however, Nunez's argument that the DAA is a contract of adhesion or otherwise unconscionable. Pl. Arbitration Br. at 2–3. As to the former, there is no allegation Chase used "high pressure tactics or deceptive language in the contract" to take unfair advantage of Nunez. *Molino v. Sagamore*, 963 N.Y.S.2d 355, 357 (2d Dep't 2013). And as to the latter, Nunez offers no evidence that the DAA was "procedurally and substantively unconscionable." *Warburg, Pincus Equity Partners, LP v. Keane*, 802 N.Y.S.2d 420, 421 (1st Dep't 2005). The mere fact that the DAA was offered "on a 'take it or leave it' basis" falls "far short" of establishing procedural unconscionability under New York law. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010).